**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SINCLAIR BROADCAST GROUP, INC., | : | |
| | : | |
| v. | : | Civil No. CCB-05-326 |
| | : | |
| INTEREP NATIONAL RADIO SALES, INC., | : | |
| | : | |

## **MEMORANDUM**

Now pending before the court is the defendant's motion to dismiss for failure to comply with the arbitration and forum-selection clauses in agreements between the parties; or, in the alternative, to transfer this action to the United States District Court for the Southern District of New York in accordance with 28 U.S.C. § 1404(a) and 28 U.S.C. §1406(a) so the New York court may compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 4; or, in the alternative, to stay all proceedings under 9 U.S.C. § 3 so the parties may arbitrate the matter in New York.

Sinclair Broadcast Group, Inc. ("Sinclair") filed its complaint against Interep National Radio Sales, Inc. ("Interep") on December 27, 2004 in the Circuit Court for Baltimore County, Maryland. Sinclair is a Maryland corporation and maintains its principal place of business in Cockeysville, Maryland. Interep is organized under New York law, and its principal place of business is New York City. The case was removable because this court has original jurisdiction under 28 U.S.C. § 1332(a), based on the complete diversity of the parties and an amount in controversy over $75,000. See 28 U.S.C. 1441(a).

The issues have been fully briefed and no hearing is necessary. See Local Rule 105.6. For the reasons stated below, the motion to dismiss will be denied, but the case will be transferred to the United

States District Court for the Southern District of New York.

## BACKGROUND

Interep is a national radio advertising representative that procures national spot advertising time for the radio stations it represents. (Def.'s Mot. to Dismiss, McEntee Decl. at ¶ 3.) In 1998, Interep represented radio stations that were owned by, or affiliated with, Sinclair. (Id. at ¶ 4.) At that time, Sinclair announced that it had acquired a significant number of radio stations from News Corporation. Interep sought to become Sinclair's exclusive national sales representative for the sale of radio broadcast time. Interep and Sinclair entered into an agreement by letter ("letter agreement") on April 20, 1998 that was signed by Robin A. Smith in her capacity as Chief Financial Officer for the Sinclair Radio Division and Les Goldberg, the President/Chief Operating Officer of Interep. (Pl.'s Opp'n to Mot. to Dismiss, Letter Agreement.)

The letter agreement designates Interep as Sinclair's exclusive national representative "for the stations being acquired from the News Corp" for ten years from the time the current station contracts could be bought out. (Id. at ¶ 1, 2.) The agreement also consists of general terms that would apply to the separate contracts contemplated for each station. (Id. at ¶ 10.) First, the existing station contracts will be "rewritten to reflect a coterminous 10-year term." (Id. at ¶ 3.) Second, the commission rate for all stations is set in the letter agreement. (Id. at ¶ 5.) Third, the agreement provides for payments by Interep to Sinclair which are essentially credits against future commissions payable to Interep under the station contracts. (Id. at ¶ 7.) Last, the letter states that if Sinclair sold "any or all" of the stations to a third party, Sinclair would have that third party assume its obligations under the relevant station contract(s). (Id. at ¶ 11.)

Shortly thereafter, the parties executed thirty individual station contracts signed by Robin Smith as Chief Financial Officer of the Radio Division and by an Interep subsidiary representative. (Def.'s Mot. to Dismiss, Station Contracts)  The individual contracts elaborate on the commission rates that were set forth in the letter agreement, explaining how and when the rates are to be paid. (See, e.g., id., Sinclair Buffalo Agreement at ¶ 4.) They also address the consequences of a transfer or sale of a station in more detail. (Id. at ¶ 9.)  More importantly, all thirty of the individual station contracts contain an arbitration provision, stating that, "[a]ny controversy or claim arising out of or relating to this contract, or the breach thereof, shall be submitted to arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association in New York, New York, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof."  (Id. at ¶ 7; McEntee Decl. at ¶ 7.)

In August 1999 Sinclair sold its radio stations to Entercom Communications Corp. ("Entercom") and Emmis Communication Corporation ("Emmis").  As provided in the letter agreement, Sinclair ensured that Entercom and Emmis assumed all of Sinclair's obligations under the agreements with Interep.  As per the letter agreement, Interep paid Sinclair the $200,000 cash portion of the signing bonus in April 2000, despite the recent sale of the radio stations.  (Pl.'s Opp'n to Mot. to Dismiss, Letter Agreement at ¶ 7; id., Bochenek Aff. at ¶ 3.)  Interep also paid the annual $100,000 payments in April 2002 and 2003 to Sinclair.  (Pl's Opp'n to Mot. to Dismiss, Letter Agreement at ¶ 9; id., Bochenek Aff. at ¶ 5-6.)  Interep did not make its April 2004 payment and informed Sinclair that it would not make any future payments under the letter agreement.  (Pl.'s Opp'n to Mot. to Dismiss,

Bochenek Aff. at ¶ 7.)  Accordingly, Sinclair instituted this action for breach of contract. [1]

## **ANALYSIS**

The Federal Arbitration Act ("FAA") manifests a liberal federal policy favoring arbitration.  See Discover Bank v. Vaden, 396 F.3d 366, 372 (4th Cir. 2005).  According to the FAA, an arbitration agreement "in any maritime transaction or a contract evidencing a transaction involving commerce...shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Thus, 'as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'"  Id. (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).

Sinclair objects to arbitration of this dispute because it maintains that it was not a signatory to the radio station agreements that contain the arbitration provision.  But, as Interep argues, under certain circumstances arbitration clauses may be enforced against a party that is not an express signatory to the arbitration agreement.  See e.g., Int'l Paper Co. v. Shwabedissen Maschinen & Anlagen GBMH, 206 F.3d 411, 418 (4th Cir. 2000)(holding that "[a] nonsignatory is estopped from refusing to comply with an arbitration clause when it [is seeking or] receives a direct benefit from a contract containing an arbitration clause."); Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995)(listing five bases "for binding nonsignatories to arbitration agreements: 1)incorporation by references; 2)assumption; 3)agency; 4)veil piercing/alter ego; and 5)estoppel."); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988)(maintaining that claims against a

---

[1]Interep expects to file a counterclaim seeking return of the payments it made to Sinclair. (Def.'s Mot. to Dismiss at 4.)

parent company that was not formally a party to the arbitration agreement can be sent to arbitration when the charges against the subsidiary and parent are "based on the same facts and are inherently inseparable").

Sinclair's argument that it is not a party to the radio station contracts is questionable. The same Sinclair executive, Robin Smith ("Smith"), signed the letter agreement and all the individual station contracts in the same capacity, as "CFO/Radio Division." If she had the capability of binding Sinclair to the letter agreement, she presumably had the same power to bind Sinclair to the station agreements.[2] Moreover, under the doctrine of apparent authority, Interep could reasonably believe based on Smith's signature that the principal, the Sinclair Radio Division, consented to the arbitration agreement. See Alamria v. Telcor Intern., Inc., 920 F.Supp. 658, 674 (D. Md. 1996).

Even if Sinclair was not a party to the radio station agreements, it could be bound to the terms of those agreements. Williston explains that "the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement to which they are not parties." See 11 Williston on Contracts, §§ 30:25 (4th ed.); Ronan Associates, Inc. v. Local 94-94A-94B, International Union of Operating Engineers, AFL-CIO, 24 F.3d 447 (2nd Cir. 1994). In this case, the letter agreement explicitly refers to the forthcoming station contracts numerous times. Based on this language, the court finds that the parties did not consider the letter to be a complete and integrated agreement, but rather that the station contracts would complete the transaction.

---

[2]Though Smith signed the letter agreement as "CFO/Radio Division," the text of the letter agreement refers to "Sinclair Radio" and "Sinclair." (Pl.'s Opp'n to Mot. to Dismiss, Letter Agreement at ¶ 1, 7-9, 11.)

Thus, the documents may be interpreted together, thereby reading the arbitration provision in the station contracts into the letter agreement. "[T]he reach of an arbitration clause is not restricted to those causes of action brought under the contract containing the clause, unless the parties draft a clause so restricted in scope." Drews Distributing, Inc. v. Silicon Gaming, Inc., 245 F.3d 347, 350 (4th Cir. 2001).

The arbitration clause in the radio station contracts is broad, covering "*any* controversy or claim arising out of or *relating to* this contract." (Def.'s Mot. to Dismiss, Letter Agreement at ¶ 7 (emphasis added.)) Almost identical language was used in the arbitration clause at issue in Drews Distributing, 245 F.3d at 350 (covering "any controversy or claim arising out of or related to" that agreement.) In Drews Distributing, the parties entered into two agreements, the second of which had the arbitration provision. Id. at 348-49. As here, the plaintiff insisted its claim was based solely on the first agreement. Id. at 350. The Fourth Circuit held that a claim based on the first agreement "related to" the second agreement and was therefore subject to arbitration. Id. at 350-51. Similarly, the letter agreement between Sinclair and Interep "relates to" the individual station contracts. As mentioned, the letter agreement contemplates the execution of the station contracts and is explicated by those contracts. Sinclair admits that it demanded a signing bonus and continuing payments, which were agreed upon in the letter agreement, because of the high liquidated damage provision in the individual station contracts. (Pl.'s Opp'n to Mot. to Dismiss at fn. 1.) Thus, as in Drews Distributing, the two are sufficiently "related" to require the breach of contract claim to be submitted to arbitration.

The arbitration agreement selects New York as the arbitration forum. Under the FAA, "[w]hen a valid agreement to arbitrate exists between the parties and covers the matter in dispute, the FAA

commands the federal courts to stay any ongoing judicial proceedings, 9 U.S.C. § 3, and to compel arbitration." Hooters of America, Inc. v. Phillips, 173 F.3d 933, 937 (4th Cir. 1999).  However, section 4 of the FAA states that "[t]he hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4.  This has been interpreted to mean that a federal district court may not compel arbitration outside its own district. See M.C. Const. Corp. v. Gray Co., 17 F.Supp.2d 541, 548 (W.D. Va. 1998).  Thus, this court may either dismiss the case, stay the proceedings, or transfer the action to the appropriate federal district court. Id.

In the interest of judicial economy, this court will transfer the case to the United States District Court for the Southern District of New York pursuant to 28 U.S.C § 1404(a) to enable that court to compel arbitration in this matter. See id. at 549; Optopics Laboratories Corp. v. Nicholas, 947 F.Supp. 817, 825 (D.N.J. 1996).  Section 1404(a) provides, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  This action could have been instituted in New York, where Interep has its headquarters, because of the parties' diverse citizenship.  Also, witnesses live or maintain business addresses there.  Finally, the arbitration provision selects New York as the forum for arbitration, and New York law was selected to govern the parties' relationship.[3]

As the court does not rely on the declaration of Leslie D. Goldberg in reaching its decision, the

---

[3]Interep's memorandum suggested that transfer also may be permissible under 28 U.S.C. §1406(a) which provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." Id.  Although I need not resolve this issue, transfer under § 1404(a) appears more appropriate. See M.C. Construction Corp. v. Gray Co., 17 F. Supp.2d 541, 549 (W.D. Va. 1998).

7

motion to strike that document will be denied without prejudice, as will the pending motion for summary judgment.

    A separate order follows.


| April 28, 2005 | /s/ |
|---|---|
| Date | Catherine C. Blake |
| | United States District Judge |